UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CARL SCAGGS and <br> NELLIE SCAGGS, <br><br> Plaintiffs, <br><br> vs. <br><br> 3M COMPANY, AS SUCCESSOR BY MERGER TO MINNESOTA MINING & MANUFACTURING COMPANY AND/OR ITS PREDECESSORS/ SUCCESSORS IN INTERST MINE SAFETY APPLIANCES <br><br> Defendants. | Case No. 4:08-CV-01163 ERW <br><br><br><br> JURY TRIAL DEMANDED |

**MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST MINE SAFETY APPLIANCES ("MSA") BASED UPON NEGLIGENCE PER SE.**

Plaintiff files this Motion for Partial Summary Judgment Against Mine Safety Appliances ("MSA") and would respectfully show the Court the following:

**I.**
**Statement of Facts**

This is a respirator product liability claim. Plaintiffs Carl and Nellie Scaggs allege product design defects and negligent manufacture of respirators manufactured by Defendants, MSA and 3M Company. Mr. Scaggs contracted the occupational lung disease silicosis while using this respiratory protection.[1] It is undisputed that Carl Scaggs

---

[1] Silicosis has been the subject of litigation and occupational safety in Missouri for generations. *See, e.g. Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018 (1949); *Smith v. Harbison-Walker Refractories Co.,* 340 Mo. 389 (1937); *see, also,* Derricson, A., "Federal Intervention in the Joplin Silicosis Epidemic, 1911-1916," *Bulletin of Historical Medicine,* Vol. 62 (2) p. 236-51 (1988).

1

suffers from silicosis.[2]  The silicosis in Mr. Scaggs's lung has progressed, with increased scarring occurring in the lung tissue.

Carl Scaggs was employed at ISP Corporation (and its predecessor company GAF Corp.) located in Annapolis, Missouri from September 12, 1966 until February 9, 2004. *See, Exhibit 1, Scaggs Job Titles, ISP Scaggs0002208.*  In February 2004, he was removed from his employment after both Mr. Scaggs and his employer learned of his diagnosis of silicosis, an occupational lung disease caused by inhalation of silica dust.

The ISP plant where Mr. Scaggs worked was in the business of manufacturing roof shingles.  A key ingredient to the production of these shingles is crushed rock, which is crushed and coated on the shingle.  This rock is mined at a quarry operation located at the facility.  The rock is then brought into the plant on a conveyor system where it is run through various rock crushers to reduce the rock's size and grade.  This crushing process produces respirable silica dust requiring respiratory protection throughout the plant.

From September 12, 1966 until approximately 1982, Mr. Scaggs used the MSA Dustfoe 66 every day when he worked at ISP as a Laborer, Batch Person, Pre-Oiler, Mill Operator, Prim Crusher Operator, Drill, Shovel Operator, Truck Driver, Maint. Trainee, Heavy Duty Mech., Mechanic "A" & "B" and a Heavy Equipment Operator.[3]  During this period of his employment, Mr. Scaggs was in the plant cleaning up and/or repairing equipment. He was required to wear the MSA Dustfoe 66 the entire time he was in the plant because of the presence of respirable silica dust.[4]  Mr. Scaggs wore respiratory

---

[2] See Exhibit 17, diagnosis by Dr. Ojile.
[3] Mr. Scaggs testified he actually began wearing the mask on September 12, 1966.  *See* Exhibit 2, Scaggs Depo. Pages 67/18 – 70/21; 222/18 – 223/15 (Firebaugh Exhibit 8 referred to in this testimony is the actual MSA Dustfoe 66 identified by Mr. Scaggs).
[4] *Id.*

2

protection at all times he was around dust.[5] During the course of his work day, he would wear his Dustfoe respirator at all times except when he was in a dust free area.

Since 1913, the United States Bureau of Mines has been charged with the responsibility for testing and approving respirators for use in quarry and/or mining operations. *See,* 30 C.F.R. Part 14, *preliminary statement (1955).*[6] In Missouri, since 1929, employers were required to provide their employees with "approved" respirators when exposed to toxic. R.S. Mo. § 292.320 (2010) *previously* R.S. Mo. 1929 § 13254 (1929)[7]. In 1970, the effective regulation for dust, fume and mist respirators was 30 C.F.R. part 14 (1965). This regulation was adopted by the U.S. Bureau of Mines on January 19, 1965 and amended on March 23, 1965[8] and June 19, 1969.[9] These regulations are also referred to as Schedule 21B and were intended to replace the Bureau's predecessor regulation Schedule 21A, adopted in 1955.[10] The Bureau of Mines periodically publishes a list of approved respirators under these schedules and explained the purpose of these revisions:

> The Bureau of Mines approval procedures involve the continual upgrading of test requirements with each succeeding revision of an approval schedule; therefore, dust respirators approved under Schedule 21B should be regarded as having greater filtering efficiency and lower breathing resistance than dust respirators approved under either Schedule 21 or 21A.

---

[5] *Id. Depo pages* 79/9 – 79/22; 80/12 – 80/25
[6] *See,* Exhibit 5.
[7] § 292.320 states, in part, that employees be provided with "adequate and approved respirators" be furnished and maintained by the employer in good condition and that "employees shall uses such respirators at all times while engaged in any work productive of noxious or poisonous dusts."
[8] *See*, Exhibit 3, 30 C.F.R. part 14 (1965).
[9] *See,* Exhibit 4, 30 C.F.R. part 14 (1969).
[10] *See,* Exhibit 5, 30 C.F.R. part 14 (1955).

3

*See,* Exhibit 6 Bureau of Mines Information Circular, *Approved Dust Respirators for Coal Mines* (May 1971).[11] The stated purpose of these regulations was to "set forth the requirements for certification of respirators designed to remove particulate matter from inhaled air as permissible for use in atmospheres that are contaminated with certain dusts, fumes or mists." 30 C.F.R. § 14.1 (1965).

Adherence to the most current schedule of regulations is considered to be very important to MSA. MSA believes that, as a reasonable and prudent manufacturer, it needs to be aware of updated regulations.[12] MSA agrees that, as a reasonable prudent manufacturer, it would need to take necessary steps to obtain compliance with a new regulation once it is adopted.[13] MSA testified it obtained a 21B certification "shortly after" the regulation was issued.[14] MSA testified that it obtained certification on that time schedule "in order to have a respirator that meets the latest Bureau of Mines requirements."[15] MSA stated that it would be important to obtain 21B certification to provide users with the latest state-of-the-art equipment for respiratory protection in order to provide continued user safety.[16] MSA testified that it was "significant" that respirators be approved with the most current approval to ensure the user that the equipment is dependable and safe.[17]

Despite these MSA admissions, MSA did not seek approval of the MSA Dustfoe 66 under 21B until <u>August 15, 1970</u>, approximately five years and six months after the

---

[11] *See,* Exhibit 6, Bureau of Mines Information Circular, *Approved Dust Respirators for Coal Mines* (May 1971) MSA/mm000849.
[12] *See,* Exhibit 7, Charles Seibel Depo. p. 186/3.
[13] *Id.* at 186/8.
[14] *Id.* at 186/16.
[15] *Id.* 186/18-19.
[16] *Id.* at 186/21-187/187/4.
[17] *Id.* at 187/11/-17.

4

21B regulations went into effect.[18] MSA did not actually obtain approval under 21B until October 15, 1970.[19] MSA made no steps to obtain approval of this respirator any earlier, even though it admits that it should have obtained the new certification "shortly" after the regulations went into effect.  MSA never contends that waiting over five and a half years to obtain approval is either reasonable or could be considered a "short" time.

Carl Scaggs began working at ISP, Inc. on September 12, 1966, which was approximately one year after the 21B regulation was promulgated.  However, the Dustfoe 66 issued to Mr. Scaggs was not a 21B approved mask, rather the old 21A (1955 approval) mask.[20] MSA had not even sough a 21B approval.  Therefore, Mr. Scaggs was provided a mask based upon ten year old respirator design technology, even though the Bureau of Mines had promulgated a new schedule for masks with greater filtering efficiency and breathing resistance one year earlier. It does not appear that Mr. Scaggs ever wore a 21B approved respirator.

MSA has no substantive explanation or excuse for its delay in obtaining 21B certification.[21]

There were significant differences between the 21A and 21B regulations.  There was also a new set of updated regulations adopted in 1972, schedule 21C.[22] Consequently, the 21B Dustfoe 66 literally was only marketable from October 15, 1970 to March 25, 1972 (one year five months) before it had to be revised again under 30 C.F.R. part 11, subpart k.

---

[18] *See,* Exhibit 8, Letter from MSA to Bureau of Mines, August 25, 1970
[19] *See,* Exhibit 9, Letter from Bureau of Mines to MSA, October 15, 1970.
[20] *See,* Exhibit 10, MSA Dustfoe 66 photographs identified by a co-worker, Robert Savage.
[21] *See,* Exhibit 7, 195/24-196/7; 233/2 – 234/2.
[22] *See,* Exhibit 15, 30 C.F.R. part 11, subpart K (March 25, 1972).  These regulations were not revised again until 1995. Furthermore, the certification and approval responsibilities were transferred from the Bureau of Mines to the new National Institute for Occupational Safety and Health (NIOSH).

While MSA did ultimately get a 21B approval, that never helped Mr. Scaggs because he never wore the 21B version, only the antiquated 1955, 21A approved model. However, even after its 21B approval in late 1970, the Dustfoe 66 certification came under heavy criticism by NIOSH, the successor agency to the Bureau of Mines.

For example, the incorporation of a protective cover over the exhalation valve was an important design distinction, when comparing the three certification schedules, 21A, 21B and 21C. Schedule 21A (1955 approvals) did not require protective coverings over exhalation valves. *See,* 30 C.F.R. § 14.5 (d)(1)(ii). However, 21B (1965 approvals) did require such a protective covering. 21B reads as follows:

> The exhalation valve(s) shall be protected against damage or external influence, and shall be provided with a dead-air space or other means designed to prevent inward leakage of contaminated air during the inhalation phase of the breathing cycle.

30 C.F.R. §14.23 (b)(2) (1965). Likewise, 21C also required these protective coverings utilizing the same language as found in the 21B regulations. *See,* 30 C.F.R. 11.137 (c) (1972). MSA concedes that the word "shroud" is another word for protective covering and did not exist on the 21A version of the Dustfoe 66.[23] MSA concedes that the meaning of the regulatory language to protect the valves from external damage "would mean a physical barrier to prevent someone from contacting them or influencing operation."[24] It is undisputed that neither the 21A nor the 21B versions of the Dustfoe 66 had a protective covering or shroud over the exhalation valve.[25] MSA further explains that a shroud or

---

[23] *See,* Exhibit 7 182/23-8;
[24] *See,* Exhibit 7, 79/15-20.
[25] *See,* Exhibit 7 182/23-183/8.

6

protective covering would provide the dead air space[26] requirements also specified in the regulation.[27]

On January 11, 1973, the head of the Bureau of Mines Testing Certification Lab informed MSA that the Dustfoe 66 would not receive NIOSH approval because the respirator did not have an "exhalation valve shroud."[28] NIOSH had also taken the stand that it would not approve the Dustfoe 66 because of "a design deficiency," including "potential field leakage" between the metal body and the rubber face piece.[29] On January 30, 1973, MSA representatives met with the NIOSH certification lab prompted by threats that NIOSH would not approve the Dustfoe 66.  At that meeting NIOSH informed MSA that, among other design problems, MSA would also have to design an "exhalation valve shroud" for the Dustfoe 66.[30]  NIOSH further instructed that MSA would have to "completely redesign" the Dustfoe 66 "to reduce potential leakage points." [31]

NIOSH threatened to rescind MSA's 21B approval in early 1973.[32] This threatened rescission was due to a collection of problems identified by NIOSH and independent laboratories working on behalf of NIOSH indicating this respirator leaked and had no protective covering over the exhalation valve. Laboratory data maintained by NIOSH reflected tests from June 19 & 20, 1972 concluding that the MSA Dustfoe 66 leaked between 3.0 and 5.4 mgs in three masks tested pursuant to the 21B regulation.[33]

---

[26] "Dead air space" is created when an exhalation valve covering or shroud creates dead air space which acts to reduce aspiration of the toxic atmosphere into the mask by precluding the inhalation of this contaminated air upon inspiration before the exhalation valve has time to close. *See,* American Industrial Hygiene Association, Respiratory Protective Devices Manual, p. 28 (1963).
[27] *See,* Exhibit 7 75/2-84/25.
[28] *See,* Exhibit 11, MSA memo from J.C. Miller to H.N. Cotabish, et al, MSA/mm001599.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *See,* Exhibit 12, MSA letter to NIOSH, March 2, 1973.
[33] *See,* Exhibit 13, MSA Interoffice Correspondence from Monsted to Dewosky, December 17, 1976.

Leakage of 3.0 and 5.4 milligrams exceeded the 21B statutory limit of 2 milligrams. 30 C.F.R. 14.31 (a) (v) (1965) (total amount of test suspension "shall not exceed 2 milligrams for any single respirator.") This leakage was further documented in testing performed by the Los Alamos Scientific Laboratory on behalf of NIOSH. Testing performed on the MSA Dustfoe 66 between July and September 1972 demonstrated "a tendency toward exhalation valve malfunction."[34] This malfunction resulted in leakage of the respirator as high as 95% on the Dustfoe 66.[35]

What is apparent from this record is that Mr. Scaggs never even had a chance to wear a 21B approved mask because MSA did not seek or obtain timely approval. Furthermore, the Dustfoe 66 tested by NIOSH in 1972 could not meet the leakage limits prescribed by § 14.31 (a) (v) of Schedule 21B.[36] MSA never ordered a stop sale of the mask or notified employers that the Dustfoe 66 was not 21B compliant.[37]

Consequently, Plaintiffs seek a partial summary judgment against MSA, asking this Court to hold as a matter of law, that MSA did not comply with the requirements of 30 C.F.R. part 14 (1965) from 1965 to October 1970 and that such noncompliance constitutes negligence *per se.*

---

[34] *See,* Exhibit 14, Quarterly Progress Report for Respirator R & D Section (1972) from Los Alamos Scientific Laboratory and Final Report, and Respiratory Studies for the National Institute for Occupational Safety and Health, July 1, 1972 – June 3, 1973
[35] *Id.* at MSA/mm001879.
[36] *See,* Exhibit 3.
[37] See, Exhibit 7 319/19 – 321/3

## II.
## The MSA Dustfoe 66 Failed To Comply With 30 C.F.R. part 14 (1965) Constituting Negligence *per se.*.

As a consequence of its non-compliance, when Carl Scaggs started work on September 19, 1966, he was provided a non-compliant, old, leaking 21A Dustfoe 66, in violation of 30 C.F.R. part 14 (1965). Despite the change in regulations in 1965, MSA did not bother to upgrade the Dustfoe 66 from a 21A to a 21B approval. This failure by MSA to update the Dustfoe to meet Schedule 21B constitutes negligence *per se.*

Violation of federal regulations "is commonly given negligence *per se* effect in state tort proceedings." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing,* 545 U.S. 308, 318-319, 125 S.Ct. 2362, 2370 (2005) *citing,* Prosser & Keeton, *Law of Torts* § 36 p. 221, n. 9 (1984) ("The breach of a federal statute may support a negligence *per se* claim as a matter of state law.") As a federal diversity jurisdiction case, Missouri substantive law applies to this case.

Under Missouri law, negligence *per se* requires that the following be established: 1) a violation of a statute or ordinance; 2) the injured party must be within the class of persons intended to be protected by the statute or ordinance; 3) the injury complained of must be of the nature that the statute or ordinance was designed to prevent; and 4) the violation of the statute or ordinance must be the proximate cause of the injury. *Moore v. Riley,* 487 S.W. 2d 55, 558 (Mo. 1972); *Lowdermilk v. Vescovo Building & Realty Co.,* 91 S.W. 3d 617, 627 (Mo. App. 2002); *Steele v. Evenflo Co. Inc.,* 178 S.W. 3d 715, 717 (2005). In analysis of negligence *per se,* the precursor is a violation of a statute. *Sill v. Burlington Northern Railroad,* 87 S.W. 3d 386, 391 (Mo. App. 2002). "In a negligence

*per se* case, the applicability of the statute said to be violated by the defendant is a matter of law for the court." *King v. Morgan,* 873 S.W. 2d 272, 275 (Mo. App. 1994).

### A. The MSA Dustfoe 66 Violated A Federal Regulation.

In this case, there is no genuine issue of material fact that, at least from March 23, 1965 to October 15, 1970 the MSA Dustfoe 66 did not comply with 21B because MSA did not even attempt to seek approval of the Dustfoe 66 under 21B. While the Dustfoe 66 did obtain certification under 21B on October 15, 1970, it still remained non-compliant because respirator testing performed by NIOSH revealed the mask leaked in excess of the 2 milligram limit prescribed by 20 C.F.R. § 14.31 (a) (v) (1965). Likewise, the Dustfoe 66 did not have a shroud or protective covering over the exhalation valve as required by 20 C.F.R. 14.23 (b) (2).

NIOSH threatened rescission if MSA did not fix these problems. While MSA ultimately fixed these design issues in 1975, <u>the redesigned mask was never worn by Carl Scaggs.</u> MSA never informed any of its users that the respirator was not 21B compliant from 1965 through 1974. MSA never recalled this mask or stopped the sale of this mask.

Accordingly the Dustfoe 66 was never in compliance with 21B, for the entire time this regulation remained in effect either because MSA did not bother to seek approval, or once approved the respirator failed the Bureau of Mines test requirements under Sections 14.31 and 14.23 of the regulation. Because there can be no dispute the Dustfoe violated Schedule 21B, this Court must find a violation occurred.

### B. Carl Scaggs Is An Injured Party In The Class Of Persons Intended To Be Protected.

It cannot be disputed that Carl Scaggs, as a worker employed in a quarry mining plant where silica containing rock is crushed, is within the class of persons intended to be

10

protected. The authority of the Bureau of Mines to promulgate regulations was derived from its founding statute which mandated the Bureau improve "health conditions and increasing safety . . . in the mining, quarrying, metallurgical and other mineral industries." *See,* Chapter 72, § 2, Public Law No. 386 (1913).  The respiratory approval regulations were clearly aimed at protecting workers in the mining and quarrying industries from injury, placing Mr. Scaggs in the class of workers the regulation intended to protect.

### C. The Injury Complained Of Is The Type This Federal Regulation Was Designed To Prevent.

The essence of 30 C.F.R. part 14 was to create an approval schedule for "Filter-Type, Dust, Fume and Mist Respirators."  30 C.F.R. part 14, Title (1965).  This regulation oversaw approval of respirators for use around "free silica" as well as many other pneumoconiosis producing dusts. 30 C.F.R. § 14.4 (b) (1) (1965).  Since the very purpose of this regulation was to provide approval of respirators for use around the specific dust atmosphere that Mr. Scaggs worked, it is equally clear that this regulation was designed to prevent occupational lung diseases such as silicosis, which is caused from inhaling excessive amounts of free silica.

### D. MSA's Violation Of The Statute Was A Proximate Cause Of The Injury.

"The simplest test for proximate cause is whether the facts show that the injury would not have occurred in the absence of a negligent act." *Martin v. City of Washington,* 848 S.W. 2d 487, 493 (Mo. Banc. 1993).  However, the negligence of the defendant need not be the sole cause of the injury, it is sufficient that it be one of the

11

efficient causes without which the injury would not have resulted. *King v. Morgan,* 873 S.W. 2d at 278 *citing, Floyd v. St. Louis Pub Serv. Co.,* 280 S.W. 2d 74 (Mo. 1955).

In this case, the facts and circumstances are sufficient to justify giving the jury a negligence *per se* instruction because the MSA Dustfoe leaked free silica, as demonstrated by NIOSH laboratory testing.[38] Furthermore, NIOSH describes the mask as having a number "potential leakage points" and required MSA to redesign the respirator to reduce leakage points.[39] Independent studies revealed leakage through the exhalation valve as high as 95%.[40] This data along with internal testing revealing leakage above the 21B regulatory limits motivated NIOSH to write the following conclusion about the MSA Dustfoe 66 on January 12, 1973:

> We have now advised M-S-A that we cannot approve the Dustfoe 66 in its present form. Our reason is the strong possibility of leakage between the rubber face cushion and metal body. Our justification for non-approval is that portion of part 11 (Section 11.63, paragraph [a]) which reads:
>
> Respirators will not be accepted by the Bureau (NIOSH) for examination, inspection and testing unless they are designed on sound engineering and scientific principles, constructed of suitable materials, and evidence of good workmanship.

*See,* Exhibit 15, NIOSH memo by Robert Schutz, Chief Engineering Branch, January 12, 1973, MSA/mm001414. By the time this memorandum was written, 30 C.F.R. part 11 (1972) had been promulgated, therefore the memo was written in the context of this regulation, 21C. However, the data supporting the memorandum was from 1972, during the purported 21B approval. Likewise, the NIOSH threat to rescind was made under 21B.

---

[38] *See,* Exhibits 13 & 14.
[39] *See,* Exhibit 12.
[40] *See,* Exhibit 14, p. MSA/mm 1870.

*See,* Exhibit 12 ("the certification of our Dustfoe 66 respirator under USBM Schedule 21b has been discussed. Moreover, the possibility that the Bureau might rescind the approval of this respirator has been suggested to us.").

The overwhelming evidence reveals the Dustfoe 66 did not comply with federal regulations and that the non-compliance caused unacceptable levels of leakage. Unfortunately, Carl Scaggs was forced to inhale excessive levels of silica while wearing the respirator causing him to contract silicosis years later. Consequently, MSA's regulatory non-compliance proximately caused Plaintiffs occupational lung disease – silicosis-- and attendant injuries.

### III.
### CONCLUSION

The attached summary judgment evidence (Exhibits 1-17), incorporated in this motion for all purposes, demonstrates that the MSA Dustfoe 66 failed to comply with schedule 21B of federal respiratory approval regulations in the following ways:

1. MSA did not seek approval under 21B for five years six months after the regulation was promulgated;

2. Government testing of the Dustfoe 66 revealed that the respirator exceeded the leakage limitation of 2 milligrams prescribed by 30 C.F.R. 14.31 (a) (v) (1965);

3. The Dustfoe 66 did not have a shroud or protective covering to prevent exhalation valve leakage as prescribed by 30 C.F.R. § 14.23 (b) (2) (1965);

Carl Scaggs wore a noncompliant 21A class Dustfoe 66 from 1970-75/6 which failed to meet the above regulatory requirements. This MSA regulatory non-compliance caused Plaintiffs employer to unknowingly violate R.S. Mo § 292.320 (2010) *previously* R.S. Mo. 1929 §13254 because Mr. Scaggs was not wearing an "approved" respirator. These

violations by MSA proximately caused Plaintiffs injury of silicosis. Plaintiffs therefore request and instruction of negligence *per se* at the time this case is tried before the jury.

                    Respectfully submitted,
                    MALONEY★MARTIN, LLP

                    /s/Mike Martin
                    Mike Martin
                    Federal #5200604
                    TX #13094400
                    The Clocktower Building
                    3401 Allen Parkway, Suite 100
                    Houston, Texas  77019
                    Telephone:  (713) 759-1600
                    Facsimile:  (713) 759-6930
                    E-Mail: mmartin@maloneymartinllp.com

                    Zane Cagle
                    MO #53775, Fed. #499604
                    1232 Washington Ave., Ste. 220
                    St. Louis, Missouri  63103
                    T:  (314) 241-4555
                    F:  (314) 241-4556
                    E-Mail:  zane@pagecagle.com

                    **ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

     Pursuant to Rule 5 of the Federal Rules of Civil Procedure, I hereby certify that a true and correct copy of the foregoing document has been provided to all counsel of record and/or attorneys-in-charge via Certified Mail, Return Receipt Requested, and/or via facsimile, and/or via hand delivery, and/or via U.S. Mail on this the  30th  day of July, 2010.

                    /s/Mike Martin
                    MIKE MARTIN